CHARLES P. WILBER, AS SOLE ACTING EXECUTOR OF THE LAST WILL AND TESTAMENT OF WILLIAM BROKAW BAMFORD, DECEASED, COMPLAINANT-RESPONDENT, v. JOHN ' OWENS, DEFENDANT-APPELLANT., AND ASBURY PARK NATIONAL BANK AND TRUST COMPANY, THE TRUSTEES OF PRINCETON UNIVERSITY ET AL., DEFENDANTS-RESPONDENTS.

Argued April 4, 11, 1949—Decided May 2, 1949.

*Mr. F. Morse Archer, Jr.,* argued the cause for the appellant.

*Mr. William E. Foster* (*Messrs. Applegate, Stevens, Foster & Reussille,* attorneys) argued the cause for the complainant-respondent.

*Mr. Donald B. Kipp* (*Mr. Charles B. Alling* and *Mr. Robert P. Hazlehurst, Jr.,* on the brief; *Messrs. Pitney, Hardin & Ward,* attorneys) argued the cause for the respondent The Trustees of Princeton University.

The opinion of the court was delivered by

HEHER, J.   The bill of complaint seeks a construction of the will of William Brokaw Bamford, deceased.

The appeal is from the decretal findings that the testator had "a general charitable intent" and the "trust created by" the tenth paragraph of the will "is a valid charitable trust," and also from the direction that the executor pay over the *corpus* of the trust to The Trustees of Princeton University "in trust to invest and reinvest the same, and to use the income in some fitting manner for scientific and philosophical research in its Department of Philosophy as said Trustees of Princeton may in their best judgment decide."

The avowed purpose of this provision of the will was the creation of a trust, to be known as the "Exton-Bamford Research Fund," and the use of "the income thereof in some fitting manner to continue and carry forward to a completion and to publish for popular understanding the results of the researches contained or outlined in" the testator's "manuscript entitled 'Random Scientific Notes seeking the Essentials in Place and Space' or by whatever future title" he "might designate them."

The learned Vice-Chancellor found that the "Random Notes" are "irrational, unintelligible, and of no scientific or other value;" that "the express purpose of the trust created by" the cited paragraph of the will "is impossible of accomplishment;" that the testator had "a general charitable intent and the trust" so created "is a valid charitable trust;" and that under the doctrine of *cy pres* Chancery was empowered to direct the use of the trust fund "to carry out as near as may be the testator's general intent and purpose:" hence, the provision for the use of the income for "scientific and philosophical research" by Princeton University, who was named by the testator as the ultimate trustee for the execution of the trust if those given the prior option of service should decline to accept the trust on the terms and conditions laid down in the will.

First, the insistence is that the testator did not have a general charitable intent. It is said that the testator's "purpose" cannot be "disassociated from his Notes;" that while he indicated the "thought" that "his notes would be of world benefit," his "basic and fundamental purpose, desire and in-

tent" was simply the "completion and publication for popular understanding of the results of his 'researches;' " and that this was "paramount and vital," and not subordinate to a general charitable intent, and a construction "severing the decedent's intent from his 'Random Notes' " would run counter to "the express terms of the will, the testimony and the evidence, all of which deny the existence of a 'general charitable intent.' "

The testamentary expression is not to be so narrowly read. It reveals a general charitable intent. The testator's dominant purpose was the devotion of his property to uses which are charitable. He gave what he considered was the bulk of his wealth to the charitable use provided in the tenth paragraph of the will. As it turned out, the bequest was far in excess of the value of his estate. The amount thus bequeathed was $150,000; and the bequest was conditioned upon the raising of a like sum by the trustee, the whole to constitute the principal of the trust in perpetuity. But the fulfillment of the trust was not made to depend upon the provision of the additional principal. In the event that the several trustees should refuse acceptance of the trust so conditioned, the same bequest was made, first to the League of Nations and, in case of a refusal, to Princeton University, in trust "for the same purposes, but upon any satisfactory terms and conditions by which" such accepting trustee "will agree to endeavor to carry out the purposes of this bequest and trust so that the results may be of benefit to the entire world." Such trustee was authorized to do the work attending the execution of the trust by its "own staff or by assignment to scientists or other qualified workers who believe that the common good of the worthy and meritorious of all mankind is greater than that of an isolated part."

Then came a series of specific and pecuniary legacies, the pecuniary legacies totalling $34,600, many of them charitable, but none to become effective until after "the provisions" of the tenth and other preceding paragraphs of the will "have been fully complied with." There was prior provision of $15,000 for the preservation of his "Random Notes" and for

a scientific analysis and appraisal of the "researches" therein "outlined," to the end that such "researches" be made available "for the use and benefit of all mankind," if they "have any practical value." And, by the thirty-third paragraph of the will, the "residue" of the testator's estate was constituted a trust designated as the "Exton-Bamford Trust," to be administered by a "voluntary association" composed of designated "representative" second cousins.

This latter trust was to continue until the youngest of his second cousins attained the age of fifty years, when the *corpus* was to be divided equally among such of his second cousins therein mentioned as should then be living. Meanwhile, the income was to be "used and applied to promote the well being of mankind and more especially the social, physical and economic welfare and efficiency of any of my relatives who are worthy and deserving and are in special need of such assistance, or of any of my relatives who have * * * acquired special merit in their own lives through their efforts to help others beyond their ordinary duty or obligation." Authority was also given to apply such income "to the use and benefit of any worthy charitable, benevolent or educational purpose; or for the establishment and maintenance of any endowments or memorials" as may be found "to be appropriate following where reasonably possible the spirit of the various provisions of my will or of my 'Random Scientific Notes.'" In this paragraph the testator urged his kin to find "a fitting way" to "overcome the evil effects of direct inheritance of unearned property." In the event that such voluntary association should not for any reason be "set up or maintained," or if the income should not be spent by such association as provided in the will, or if all of the second cousins therein appointed to form and maintain the association should die "before the youngest one shall have attained the age of fifty years," then the residue of his estate would pass to the National Academy of Sciences at Washington, "in trust, as far as may be possible, as set forth to establish the 'Exton-Bamford Research Fund' for the purposes and under the same terms and conditions as provided" in the tenth paragraph of the will.

A general charitable intention is outstanding in these provisions. The design of the trust created by the tenth paragraph is the advancement of education and learning, and therefore it is a charitable trust. Trusts for the advancement of knowledge by research or otherwise are charitable. A gift for the benefit of an indefinite number of persons, by bringing their minds or hearts under the influence of education or religion, among other purposes, is a charity in the legal sense. *George v. Braddock,* 45 *N. J. Eq.* 757 (*E. & A.* 1889); *Mac-Kenzie v. Trustees of Presbytery of Jersey City,* 67 *N. J. Eq.* 652 (*E. & A.* 1905); *Vineland Trust Co. v. Westendorf,* 86 *N. J. Eq.* 343 (*Ch.* 1916); affirmed, 87 *N. J. Eq.* 675 (*E. & A.* 1917); *Noice v. Schnell,* 101 *N. J. Eq.* 252 (*E. & A.* 1927); *Crane v. Morristown School Foundation,* 120 *N. J. Eq.* 583 (*E. & A.* 1936); *Whicker v. Hume,* 7 *H. L. C.* 124 (1858); *United States v. Drummond,* 7 *H. L. C.* 155 (1838); *Jackson v. Phillips,* 14 *Allen* 539; *Commissioners for Special Purposes of Income Tax v. Pemsel, A. C.* 531 (1891). A trust is charitable if the subject property is devoted to the accomplishment of purposes which are beneficial or may be supposed to be beneficial to the community. This is the prime distinction between private trusts and charitable trusts. The question is whether the accomplishment of the purpose is of such social interest to the community as to justify the dedication of the property to that purpose in perpetuity. Are the persons to benefit of a sufficiently large or indefinite class to give rise to community interest in the trust? Will the trust in operation advance the religious, educational, eleemosynary, governmental or other charitable interests of the community? *Woodstown National Bank v. Snelbaker,* 136 *N. J. Eq.* 62 (*Ch.* 1944); affirmed, 137 *N. J. Eq.* 256 (*E. & A.* 1945); *Scott on Trusts,* §§ 348, 364, 368.

It was obviously not the testator's design to confine the trust created in paragraph ten to the mere publication of his "Random Scientific Notes" and the "results" of *his* "researches." He believed that the subject matter of the Notes provided the core for continued philosophic and metaphysical research that would be of inestimable benefit to mankind. The

*quantum* of the trust fund, to run in perpetuity, is itself significant of this intention. He had evolved a social philosophy in which the economic "parasite" had no part. His worldly goods were largely inherited; and it was his belief that inherited wealth lays upon the possessor the solemn duty and responsibility of making "worthy use" of the inheritance. He had no kin nearer than first cousins; and he had determined to devote the major part of his property to the service and enrichment of his fellows. He sought to add "a small bit to the sum-total of desirable human knowledge, for the use and benefit of mankind." This we find in the "Introduction" to the first volume of his Notes. True, his Notes contributed nothing to the sum of human knowledge; and their development would not add to wisdom. Indeed, they have been termed "irrational and incoherent." Dr. Scoon said a part was understandable and a part not. Yet to the testator the text was real and vital and entirely reasonable and in keeping with his own meager understanding of the subject. No doubt, the testator's limited knowledge of the matter rendered him incapable of assessing the importance of his findings. Perhaps, he was not sufficiently tutored in the subject to voice with any degree of accuracy the thoughts that were striving for expression. But there can be no doubt of his ceaseless yearning to be of service to human kind and to use his property to that end. He conceived that his reflections and conclusions would provide the basis and the impetus for philosophic research that would in the end be socially constructive and otherwise serve the common good; but the charitable intent does not depend upon the scientific validity of his views or the depth of his understanding. We are not concerned with his philosophic or sociologic orthodoxy or rationality. Whatever the utility of his contribution, his undoubted aim was the use of his Notes as the beginning of an undertaking that would in scientific hands redound to the advantage of mankind. That was his avowed purpose. The will abounds in expressions to that effect. And in a summary or outline of his Notes, dictated shortly before his death, he declared that "The present world conditions and

the critical post-war problems of world wide adjustments present a challenge to any thinking which offers promise of improved human relationships." This is an understandable commentary and a wholly rational aspiration, although the cynic would say an aspiration foredoomed. In a letter to Dr. Bowman, the president of Johns Hopkins College, written in 1935, he spoke of the trust as a means "to carry forward a research work in pure science at which I was then and still am active." And to Dr. Millikan he wrote, in the same year, of the execution of a will, still subsisting, bequeathing a trust fund of $150,000 "to carry forward a prosearch work in pure science at which I was then and still am active." But he realized that the content of his Notes might prove to be of little or no practical value. He knew the Notes were incomplete; his dominant purpose was continued research in the chosen field for the common benefit.

While the content of the Notes themselves may be wanting in scientific coherence and rationality, the ultimate aim of the testator was not irrational or absurd, and therefore the trust does not fail on this account. His was a "search for truth," not the propagation of nonsense or folly or the dissemination of absurd ideas. Even where the opinion sought to be propagated is "foolish or * * * devoid of foundation," the bequest is not necessarily void as a charitable use. *Thornton v. Howe*, 31 *Beav.* 14. See, also, *George v. Braddock, supra*. In an early case in Massachusetts, the court upheld a trust to establish and maintain a school to be taught by females in which no books of instruction were to be used except spelling books and the Bible. *Tainter v. Clark*, 5 *Allen* 66 (*Mass.* 1862). If the general purposes for which the trust is created may reasonably be regarded as in the interest of the community, the mere fact that the members of the court and the vast majority of the people believe that the particular purpose is unwise does not serve to render the trust noncharitable. *Scott on Trusts*, 374.7. In an Irish case, upholding a trust to promote vegetarianism, Lord Justice Fitz Gibbon said that the test of beneficence is met if the "benefit" is "one which the founder believes to be

of public advantage," and "his belief" is "at least rational, and not contrary either to the general law of the land, or to the principles of morality." He continued: "A gift of such a character, dictated by benevolence, believed to be beneficent, devoted to an appreciably important object, and neither *contra bonos mores* nor *contra legem,* will, in my opinion, be charitable in the eye of the law, as settled by decisions which bind us. It is not for us to say that these have gone too far." *In re Cranston,* 1 *I. R.* 431, 446-7 (1898).

The bequest here is for research in the sciences of philosophy and metaphysics for the ultimate good of mankind; and this is a charitable use wholly devoid of the element of illegality, immorality or absurdity, even though the matter provided by the testator as the basis for the inquiry is utterly without scientific or other value. The general purposes for which the trust was created are indubitably conducive to the common interest.

The trust does not fail because it is impossible or impracticable to carry out the particular charitable purpose. The judicial power of *cy pres* is invocable to effectuate the more general intention to devote the property to charitable uses. The words *"cy pres"* are Norman French meaning "so near" or "as near;" and the term itself suggests the limitations of the principle. *Cy pres* is "the doctrine of nearness or approximation." *MacKenzie v. Trustees of Presbytery of Jersey City, supra; Crane v. Morristown School Foundation, supra.* Where fulfillment of the specific charitable intent cannot be had, equity will in the exercise of the power apply the property to a similar charitable purpose in accordance with the more general charitable intent. This on the theory that the testator would have so ordained if he had realized that it would be impossible to carry out the particular purpose. By this process, the intention of the testator is fulfilled as nearly as it is possible to do. *Scott on Trusts,* §§ 399, 399.2. We find nothing to indicate a purpose to terminate the trust here if the specific intent failed of attainment. The special intent was but a means to an end. The particular purpose was subordinate to the general charitable intention;

and the decree constitutes a proper exercise of the power of *cy pres*. It falls within the general charitable intention and approaches as nearly as may be the particular purpose of the settlor.

Even where it is possible to carry out the particular purpose, the principle of *cy pres* is applicable if the fulfillment of the more specific intention would frustrate the general charitable intention of the settlor. It is then "impracticable" to carry out the particular purpose. *St. James Church v. Wilson,* 82 *N. J. Eq.* 546 (*Ch.* 1913) ; affirmed on this point *sub nom., West v. St. James' Episcopal Church,* 83 *N. J. Eq.* 324 (*E. & A.* 1914) ; *Restatement, Trusts,* § 399, *Comment M.*

Where the principle is applicable, Chancery will give heed, in seeking for a charitable purpose falling within the general charitable intention, not only to the language of the trust instrument itself, but to all the circumstances tending to indicate the settlor's probable desires if he had realized that the particular purpose could not be carried out. *Restatement, Trusts,* § 399, *Comment C.* This is according to the general canon of construction. *In re Fisler,* 133 *N. J. Eq.* 421 (*E. & A.* 1943).

The decree is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, HEHER, BURLING and ACKERSON—5.

*For reversal*—None.