*In re* ROOD ESTATE

HANNAH v ATTORNEY GENERAL

1. Trusts—Charitable Trust—Specific Charitable Intent—Res Judicata.

A determination that a charitable trust exists is not a determination that the testator had general charitable intent as opposed to specific charitable intent and a finding of the existence of a charitable trust is not *res judicata* on the issue of whether there was general charitable intent as opposed to specific charitable intent.

2. Trusts—Specific Charitable Intent—Cy Pres—Standing.

A trust that has no general charitable purpose in mind but instead one or more particular purposes which are impossible of fulfillment will revert to the donor's estate or to his heirs at law, even in the absence of an express reversionary provision; the possibility of reverter is sufficient to give the heirs at law "standing" to challenge the application of the *cy pres* doctrine to reform the trust.

3. Trusts—Cy Pres—Elements.

Three prerequisites are necessary for the application of the *cy pres* doctrine: first, the court must determine whether the gift creates a valid charitable trust; second, it must establish that it is impossible or impractical to carry out the specific purpose of the trust; and finally, the court must determine whether, in

References for Points in Headnotes
[1] 15 Am Jur 2d, Charities §§ 8, 9, 135.
[1–4] General charitable intent as essential to cy pres doctrine. 74 ALR 671.
[2] 15 Am Jur 2d, Charities §§ 133, 135.
[3] 15 Am Jur 2d, Charities § 133.
[4, 9, 10] 15 Am Jur 2d, Charities § 142.
[5] 15 Am Jur 2d, Charities § 8
    57 Am Jur, Wills § 170.
  Charitable gifts; definiteness. 163 ALR 784.
[6–8] 15 Am Jur 2d, Charities § 135.

creating the charitable trust, the testator had a general charitable intent.

4. Trusts—Plan of Effectuation—Impossible Plan.

The failure of a testator to formulate a practical plan to carry out the purpose of his charitable trust or the selection of an illegal or impractical method of doing it will not defeat the gift; a gift that requires the teaching of political science from testator's books, the purchase of which could bankrupt the charitable trust within a few months, is a purpose impossible to achieve.

5. Trusts—Charitable Trust—Wills—Construction.

A will creating a charitable trust must be construed so as to avoid intestacy if at all possible and in a manner which is consistent with the favoritism which the law has toward upholding a charitable gift or trust.

6. Trusts—General Charitable Intent.

The absence of a reverter clause and the fact that the bulk of donor's property is given for charitable purposes in a will creating a charitable trust is evidence that the testator has a general charitable intent rather than a specific charitable intent.

7. Trusts—Wills—Construction—General Charitable Intent.

A provision in testator's will directing that the educational purposes of his charitable trust be fulfilled by another school or college in the event that the named trustees failed adequately to fulfill them, is an indication that testator's charitable intent was general rather than specific.

8. Trusts—General Charitable Intent.

A general charitable intent requires only a charitable purpose which is broader than the particular purpose the effectuation of which is impossible, impracticable, or illegal, not an intention to benefit charity generally.

9. Trusts—Cy Pres—Impossible Plan.

The *cy pres* doctrine is applicable to a trust giving money to certain colleges upon the condition that the testator's books be distributed to all students taking political science, a condition that could bankrupt the trust within a few months, where the will creating the trust had no reverter clause and gave the bulk of testator's property to charity.

10. Trusts—Cy Pres—Impossible Plan.

The *corpus* of a charitable trust requiring the teaching of ultra-

conservative political science, under a plan that is impossible to perform but that may be reformed by application of the *cy pres* doctrine, may be used to teach courses in conservative or comparative political science but not liberal political science.

Appeal from Lapeer, James P. Churchill, J. Submitted Division 2 January 4, 1972, at Lansing. (Docket No. 11029.) Decided June 26, 1972. Leave to appeal denied, 388 Mich 766.

Complaint by John A. Hannah, Gorton Riethmiller, and Robert D. Swanson, trustees under the will of John R. Rood, against Frank J. Kelley, Attorney General, to obtain construction and interpretation of the will and codicil. Royal Rood and Marion Belle Rood, sole heirs at law of John R. Rood, joined as parties defendant. Defendants Royal Rood and Marion Belle Rood appeal the determination of the trial court. Affirmed and remanded.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Bethel B. Kelley* and *Martin C. Weisman),* and *Taylor, Carter & Butterfield,* for plaintiffs Gorton Riethmiller and Robert D. Swanson.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Edwin M. Bladen,* Assistant Attorney General, for defendant-appellee Attorney General.

*Transue, Goodstein & Goodstein,* for defendants Royal Rood and Marion Belle Rood.

Before: LESINSKI, C. J., and McGREGOR and QUINN, JJ.

McGREGOR, J. John R. Rood died on December 23, 1961, leaving a will dated February 4, 1954,

and a codicil dated April 6, 1955. The will was ordered to probate on March 19, 1962, and the codicil was ordered to probate on April 2, 1962. The will created a testamentary trust in which the residue and remainder of the estate was devised to Michigan State College, Alma College, and Olivet College. The presidents and their successors of these institutions were named as trustees. The provisions of the will and codicil required that political science be taught by the colleges, as specified therein, and books written by Rood be distributed in a required manner.

On February 15, 1965, the trustees filed a complaint in the Circuit Court for Lapeer County, seeking construction of the will and codicil. An amended complaint and second amended complaint were subsequently filed, elaborating upon the "impossibility, impracticality and illegality" of various provisions in the will and codicil.

These pleadings requested relief in the form of a construction of the trust "to permit the income to be used in accordance with the rules, regulations and teaching practices of each of said institutions for the teaching of political science". Plaintiffs requested an application of *cy pres* to permit compliance with the provision requiring the dissemination of Rood's books by making said books available in the institutions' libraries.

In March, 1967, defendants-appellants filed a cross-complaint, seeking an accounting and the assets of the estate on the theory that the trustees did not intend to carry out the terms of the will and that their action to obtain its construction constituted a renunciation of the trust. Plaintiffs filed a motion for summary judgment. The trial judge issued a written opinion on January 10, 1968, granting this motion. On February 29, 1968,

the trial court issued an order determining that John R. Rood's will and codicil created a charitable trust, and granted plaintiffs' motion for summary judgment, dismissing defendants-appellants' cross-complaint. From this order, defendants-appellants filed an interlocutory appeal, and this Court affirmed the judgment of the lower court. *In re Rood Estate,* 16 Mich App 689 (1969), *leave den* 382 Mich 782 (1969).

The matter was returned to the circuit court, where evidence was heard upon the remaining issues raised by plaintiffs' complaint as amended. Initially, the trial judge questioned the legal capacity for defendants-appellants' participation in the proceedings, but defendants-appellants contended that they possessed "standing". The plaintiffs challenged this contention and the trial judge concluded that defendants-appellants were not "interested parties" in a legal sense because their rights to receive the trust assets had been negated by the prior Court of Appeals decision upholding the charitable nature of the trust. The trial judge recognized defendants-appellants' personal interest and permitted their participation on an *amicus curiae* basis.

At the hearing, plaintiffs sought an interpretation of the trust provisions and reformation or elimination of the requirements imposed by two provisions. They offered the deposition of Dr. Hannah, President of Michigan State University, to prove that compliance with the requirement to distribute copies of the testator's books to students would exhaust the trust's funds. Each of three books to be distributed would cost $2–$3 and there would be 14,381 students eligible to receive the books in one term. The total cost per term for compliance by Michigan State University would

approximate $135,000. Subsequent evidence indicated that approximately 300 students per year would be eligible to receive the books at Alma College, at an approximate expense to the trust of $2,700.

The attorney general defendant sought a modification of the will and codicil because the administrative conditions imposed by their provisions were illegal, impossible, or impractical. Testimony was offered by professors of political science that the requirements placed upon the teachers to "distribute testator's books" which reflect the testator's "ultra-conservative" philosophy would infringe upon their academic freedom. The opinion of the testimony was that the testator's books (1) presented a philosophy that is viewed with disfavor, (2) were poorly written and out-of-date, and (3) could not be used as textbooks. Various plans, including lecture series, copies of Rood's books being placed in specially reserved corners of shelves in the library, creation of fellowships in the area of concern to the testator, inclusion of the testator's books in bibliographies given to students, all were alluded to by these witnesses as possible methods of fulfilling the terms of the trust. Additional evidence procured at this hearing established that the appraised value of the trust was $452,000 as of December 21, 1968.

Subsequent to the conclusion of this two-day hearing, the trial judge issued a written opinion construing the provisions of the trust. This opinion, dated January 5, 1970, found that the testator's dominant purpose was to promote the teaching of certain political theories, and that such purpose was impossible to achieve. However, the trial judge found the existence of a general charitable intent and directed the colleges to submit

"plans" for variant uses of the trust funds in conformity with this general intent. Pursuant to this direction of the court, Alma and Olivet Colleges submitted similar plans. On October 8, 1970, the trial judge issued a written opinion which (1) approved Olivet's plan as drafted, (2) approved Alma's plan as modified, and (3) rejected Michigan State University's prior proposal and directed it to submit a plan or forfeit its portion of the bequest. The University failed to submit the requested plan.

Judgment was entered on December 21, 1970, denying any funds to Michigan State University, and dividing the trust assets between Alma and Olivet Colleges in accordance with the trial judge's opinion of October 8, 1970. From this judgment, defendants-appellants appeal, alleging that since Rood's trust was specific in purpose and beyond the doctrine of *cy pres,* it must fail, causing the assets to revert to the heirs of John R. Rood.

## I. *Res Judicata.*

The first issue on appeal is whether a testator's heirs are barred by the doctrine of *res judicata* from challenging the validity of a trust on a theory that the trust is specific in purpose and not subject to *cy pres,* when a prior court decision has held the trust to be charitable in nature.

In its opinion dated January 10, 1968, the trial court concluded:

"For these reasons it is my opinion that the will and codicil of John R. Rood, deceased, do create a charitable trust. Plaintiff's motion for summary judgment dismissing the cross-complaint is granted. Plaintiffs should submit an appropriate form of order."

In an addendum, the trial court stated:

"The issues *yet to be determined* in this action are closely related to the issues raised by the motion for summary judgment." (Emphasis added.)

Pursuant to its opinion, the trial court issued the following order on February 19, 1968:

"Plaintiffs having filed a motion for summary judgment dismissing the cross-complaint of Royal Rood and Marion Rood and the matter being before the court and having been argued by counsel and briefs having been filed and the court having determined in his opinion that the will and codicil of John R. Rood did create a charitable trust.
"It is ordered that plaintiffs' motion for summary judgment dismissing the cross-complaint of Royal Rood and Marion Rood is granted."

On appeal from the above order, this Court treated defendants' (cross-plaintiffs') appeal as an attack on the validity of the will of John R. Rood. *In re Rood Estate, supra,* 690. This Court held:

"The will was admitted to probate March 19, 1962, and the codicil was admitted April 2, 1962. The time for appeal from admission to probate has long since elapsed. MCLA § 701.44 (Stat Ann 1969 Cum Supp § 27.3178[44]). The validity of the will and codicil is not subject to attack."

Also affirmed by this Court was the trial court's holding that the "will and codicil created a charitable trust".

Although the trial court did discuss the question of general charitable intent, this issue was not judicially determined in the trial court's order of February 19, 1968, nor did this Court consider the question of general charitable intent. A determination that a charitable trust is created needs only a

finding that "some charitable purpose" exists. This purpose is satisfied by the existence of either a *general* or *specific* charitable purpose. Thus, a specific finding that one exists to the exclusion of the other is not necessary for the initial determination that a charitable trust is created, provided the instrument evidences the existence of one of these elements. The determination that a charitable trust exists is not a determination that the testator (settlor) had general charitable intent as opposed to specific charitable intent.

As the question of whether the testator had general charitable intent was not previously determined, our previous decision is not *res judicata* on that issue on this appeal.

## II. Standing.

Plaintiffs argue that the *Rood* decision nullified any beneficial interest defendants had in the trust. In the absence of a provision for reverter, case law precludes any interest in the heirs based upon a breach or nonexecution of the trust. They conclude that defendants have no "standing" and the instant litigation is essentially a matter between the plaintiffs-trustees and the attorney general, who is responsible for supervising charitable trusts, pursuant to MCLA 14.251; MSA 26.1200.

The case law cited by plaintiffs is distinguishable and this position is devoid of merit. The propositions relied upon by plaintiffs concern the necessity for a reversion clause to give heirs an interest upon the breach or nonexecution of a trust by the trustees. The present appeal is founded upon the theory that Rood's trust contained a specific purpose and that noncompliance with this purpose results in a reversion of the trust assets to the heirs. This proposition is clearly recognized and

gives defendants-appellants standing in the present appeal.

It is a general proposition of law that:

*"The [trust] fund will revert to the donor's estate or to his heirs at law* even in the absence of an express provision therefor, if it is clear that he had no general charitable purpose in mind but instead *contemplated the carrying out of one or more particular purposes which are impossible of fulfillment.* \* \* \* "[1] (Emphasis added.)

Similarly, it has been stated that "if no general charitable intendment appears from the instrument of gift and the *cy pres* doctrine accordingly cannot be applied to save it from being totally ineffective, the gift will revert \* \* \* ".[2] The reversion to a donor's heirs depends entirely upon the existence of a specific charitable intent to which the doctrine of *cy pres* is inapplicable. This principle is codified in the Restatement of Trusts (2d). Section 413 of the Restatement provides that the transferee hold the trust estate upon a resulting trust for the transferor or his estate if the charitable purpose cannot be accomplished unless the doctrine of *cy pres* is applicable. Section 399 of the Restatement applies the doctrine of *cy pres* only if the settlor has manifested a general charitable intention. The Court, in *Kostarides v Central Trust Co,* 370 Mich 690, 695 (1963), approved these principles although finding a general charitable purpose upon the facts presented. This authority is sufficient to indicate that defendants have a legal interest, "standing", in order to pursue this appeal.

[1] 14 CJS, Charities, § 67, p 535, and cases cited at fn 56.

[2] 15 Am Jur 2d, Charities, § 127, pp 134–135. *Accord,* Bogert, Trusts & Trustees (2d ed), § 418, pp 364, 370.

### III. The *Cy Pres* Doctrine.

The *cy pres* doctrine has been variously defined by different writers. The common factor generally recognized is that it is a saving device applied to charitable trusts so that when the specific purpose of the settlor cannot be carried out, his charitable intention can be fulfilled as nearly as possible. The phrase, *cy pres,* is said to be derived from the Norman French expression, *cy pres comme possible,* which is translated to mean "as near as possible".[3] Bogert[4] defines the *cy pres* doctrine as:

" * * * the doctrine that equity will, when a charity is originally or later becomes impossible, inexpedient, or impracticable of fulfillment, substitute another charitable object which is believed to approach the original purpose as closely as possible. It is the theory that equity has the power to revise a charitable trust where the settlor had a general charitable intent in order to meet unexpected emergencies and changes in conditions which threaten its existence."

Scott[5] states the doctrine as follows:

"Where property is given in trust for a particular charitable purpose, the trust will not ordinarily fail even though it is impossible to carry out the particular purpose. In such a case the court will ordinarily direct that the property be applied to a similar charitable purpose. The theory is that the testator would have desired that the property be so applied if he had realized that it would be impossible to carry out the particular purpose. The courts usually put it this way, that although the testator intended that the property should be applied to the particular charitable purpose named by him, yet he had a more general intention to devote the property to charitable purposes. The testator would

---

[3] *Ironmongers Co v Attorney General,* 10 Cl & F 908, 922 (1844).

[4] Bogert, Trusts & Trustees (2d ed), § 431, p 390.

[5] 4 Scott, Trusts (3d ed), § 399, p 3084.

presumably have desired that the property should be applied to purposes as nearly as may be like the purposes stated by him rather than that the trust should fail altogether."

Restatement of Trusts (2d)[6] defines the *cy pres* doctrine as follows:

"If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general intention to devote the property to charitable purposes, the trust will not fail but the court will direct the application of the property to some charitable purpose which falls within the general charitable intention of the settlor."

Before the *cy pres* doctrine can be applied, three prerequisites must be met. First, the court must determine whether the gift creates a valid charitable trust; second, it must be established that it is impossible or impractical to carry out the specific purpose of the trust;[7] and finally, the court must

---

[6] Restatement of Trusts (2d), § 399.

[7] It should be noted that the *cy pres* doctrine is inapplicable when the particular purpose of the testator (or settlor) can effectively be carried out subject to some deviation in the method of administration of the trust. Bogert describes this doctrine of deviation as follows:

"The court possesses a second important power, namely, that of changing, or permitting the trustee to change, the methods of administration set forth in the trust instrument, when this is deemed necessary or highly desirable in order to enable the trustee to perform the trust. This is called the power of the court to sanction deviation from the terms of the trust. The difference between this power and the *cy pres* power is not always observed by the courts. Sometimes an order which merely relieves the trustee of a handicapping limitation found in the trust instrument or merely permits the trustee to use funds to forward the original purposes of the trust in new ways, is called the use of *cy pres;* whereas in reality it is a departure from the prescribed methods of operation without in any way varying the end results which the donor envisaged. While the effects of using these two powers are similar, the procedure, formalities, and evidence required for the use of one power may be different from the requirements applying to the use of the other power. Thus,

determine whether, in creating the charitable trust, the testator (or settlor) had a general charitable intent.

The question of the application of the *cy pres* doctrine has not arisen very frequently in Michigan. *In re Hannan's Estate,* 227 Mich 569 (1924), includes a dictum that the Court would unhesitatingly apply the *cy pres* doctrine if necessary, but in that particular case it was not required. In *Scudder v Security Trust Co,* 238 Mich 318 (1927), the Court stated that the statute now in force (authorizing charitable trusts) clearly intends the application of the doctrine of *cy pres.* In *John Robinson Hospital v Cross,* 279 Mich 407 (1937), without expressly mentioning the *cy pres* doctrine it was applied by holding that a sum of money which was given to a trustee to be invested and the income used to maintain a room and bed which bore the name of the testatrix in a designated hospital, did not lapse nor did it entitle the trustee to withhold the income from the hospital when the hospital was taken under a different ownership and management and ceased to be operated as a charitable institution. The doctrine of *cy pres* was first expressly affirmed and applied in *Gifford v First National Bank of Menominee,* 285 Mich 58 (1938). There, the testator provided for the formation of a trust fund to be devoted to certain charitable purposes. The fund had shrunk in value and in order to carry out the testator's

reference to a master to frame a scheme under the *cy pres* power may be required by law or be customary under the usual practice, whereas it may not be needed in the application of the authority to permit deviation. Deviation from the administrative provisions of a charitable trust can be authorized, even though the trust possessed a narrow and not a general trust intent, whereas *cy pres* could not be used in such a case." Bogert, Trusts & Trustees (2d ed), § 394, pp 236–237.

In the instant case, the doctrine of deviation is inapplicable as the testator's dominant purpose is impossible to achieve. See p 12 *infra.*

plan the probate court had approved a compromise agreement. The question involved in this suit was whether the legacy was rendered void as impractical and impossible of performance. The opinion held that the rule of *cy pres* was recognized in Michigan and the Court authorized the purpose of the testator to be carried out as nearly as possible.

On the question of whether a valid charitable trust was created, the trial court determined that John R. Rood's will and codicil created a valid charitable trust, and this Court affirmed that determination. *In re Rood Estate, supra, leave den,* 382 Mich 782 (1969).

Subsequent to the first *Rood* appeal, the trial court found that testator's specific purpose was impossible to achieve. In its opinion of January 5, 1970, the trial court stated:

"The court has been asked to strike or modify certain clauses of the codicil, for one reason or another and then construe what's left. The will and codicil must be read together, as they were written, to determine testator's intent. We must construe them, if possible in the way testator wanted them construed. If we disregard, for the moment, the difficulties that can be anticipated in carrying out his intent, his intention is not difficult to discern. His dominate *[sic]* purposes are clear. HE WANTED THE INCOME OF THE RESIDUE OF HIS ESTATE TO BE USED TO PROMOTE THE TEACHING OF CERTAIN DEFINED POLITICAL AND ECONOMIC THEORIES, *AND HE WANTED THESE THEORIES TO RECEIVE GREATER EMPHASIS IN THE COLLEGE UNDERGRADUATE CLASSROOM THAN THEY WOULD RECEIVE BUT FOR HIS GIFT.* [Emphasis by the trial court.]

"He didn't want to buy more of the same. He wanted to buy something different. He wanted nothing less than to change and control the subject matter of basic college courses. He wanted nothing less than to control the manner in which the instructor teaches his course.

"No legitimate institution of higher learning could permit this kind of control of the classroom from the grave. It is the opinion of this Court that the dominate purposes of William R. Rood, as above defined, are impossible to achieve. If the income of the residue of the testamentary trust are to be used to promote special understanding by students of those political and economic theories favored by Rood, it must of necessity be done outside of the undergraduate classroom."

An examination of Rood's will and codicil fully supports the trial court's findings. Excerpts from Rood's will provide:

"THIRD. Lest my intentions should be frustrated by teaching political practices other than such as is necessary to understand the application of the natural laws, *and teaching doctrines contrary to my own, I deem it necessary to set forth here the bare bones of political science, as I desire it taught * * * .*"[8] (Emphasis added.)

"EIGHTH. I give, devise and bequeath all the residue and remainder of my estate * * * to be held in perpetuity *for the purposes of this will.*" (Emphasis added.)

"TWELFTH: It is my wish that *the residue of said estate be kept as a perpetual fund, the income only being used to teach political science, as above specified, in the said colleges, and in other schools and by public debates, under the limitations above described.*" (Emphasis added.)

Rood's codicil provides:

"3. *It is not my desire to dictate opinions or doctrines to any teacher or to abridge freedom of expression. Each teacher in any school receiving benefits under this Will announcing any doctrine conflicting with the contents of said books shall at the time of making such statement explain to the members of the class why and wherein the statements in said books are mistaken or*

---

[8] The 'bare bones' of testator's political philosophy fill 11 pages of testator's 15-page will. See Appendix.

*erroneous; and each school or college receiving benefits under this Will, shall offer courses covering the substance of the matter contained in said books."* (Emphasis added.)

"4. Any school or college organized and operating in the State of Michigan which shall establish by a Decree of a Court of Record of this State that any school or college receiving benefits under this Will has for the period of one year or longer violated the provision of my Will shall for the succeeding twenty-five years receive the benefits under this Will which were formerly paid to the negligent or offending school under the same conditions as such former school."

The failure of the testator to formulate a practical plan to carry out his charitable purpose will not defeat the gift. *Thompson's Estate,* 282 Pa 30; 127 A 446 (1925); *Wilber v Owens,* 2 NJ 167; 65 A2d 843 (1949); *Collins v Lyon, Inc,* 181 Va 230; 24 SE2d 572 (1943).

Similarly, the selection of an illegal or impracticable method of carrying out testator's purpose will not invalidate the gift. *Morgan v National Trust Bank of Charleston,* 331 Ill 182; 162 NE 888 (1928); *Peek v Woman's Home Missionary Society,* 304 Ill 427; 136 NE 772; 26 ALR 917 (1922); *Franklin v Hastings,* 253 Ill 46; 97 NE 265 (1911); *In re Scanlan's Estate,* 230 Ill App 505 (1923).

We affirm the trial court's determination as to the purposes specified in Rood's will and the trial court's finding that Rood's specific purpose was impossible to achieve.

The final requirement for the application of *cy pres* is a manifestation of general charitable intent by the testator. Although the particular charitable purpose cannot be carried out, if Rood had indicated a more general charitable intent extending beyond the specific purpose which has now become impractical or impossible, *cy pres* would be ap-

plied. Bogert describes this general charitable intent as where the donor "had a general or broad charitable intent, that is, that he showed that he intended to aid charity in general or some particular type of charity in general * * * ".[9]

---

[9] Bogert, Trusts & Trustees (2d ed), § 436, p 422. Bogert comments on this requirement as follows:

"The requirement and its application can be criticized adversely. Unless the settlor expressly accepted the *cy pres* rule for his trust, or negated the application of it, it seems very doubtful whether he gave any thought to the disposition of the charitable fund in the case of failure of the charity. He assumed that the charity could and would be carried out. Secondly, if it be assumed that a finding of an actual intention to have a general or special charitable intent can be made by the court on the basis of the donor's situation and interests and the language of the trust instrument, it can be argued that the facts usually available form a very slender basis for such a finding, that the courts are in reality deciding what they think would have been the intent of the settlor if he had given attention to the matter, and that directly opposite results in cases where the facts are similar prove the unsatisfactoriness of the search for the settlor's intent.

*"The use of the general or special charitable intent rule causes many claims by the heirs or next of kin of the trustor and much expensive and time-consuming litigation.*

"Instead of continuing the present rule it would seem preferable to provide that the charitable intent shall be presumed to be general, unless the settlor expressly negates the application of *cy pres;* or to follow the Pennsylvania precedent and make *cy pres* applicable whether the settlor's charitable intent was found to be general or special." (Emphasis added.) Bogert, *supra,* p 424.

Similarly, Scott discusses the application of *cy pres* as follows:

"This principle is easy to state but is not always easy to apply. It is seldom that the testator's intention can be definitely analyzed and divided into a particular and a general intention. It is ordinarily impossible to determine what disposition the testator intended should be made of the property if his particular purpose could not be carried out. *Indeed, it is ordinarily true that the testator does not contemplate the possible failure of his particular purpose, and all that the court can do is to make a guess not as to what he intended but as to what he would have intended if he had thought about the matter."* (Emphasis added.) 4 Scott, Trusts, § 399.2, p 3094.

The Pennsylvania "precedent" referred to by Bogert is a statute which provides:

"Except as otherwise provided by the conveyor, if the charitable purpose for which an interest shall be conveyed shall be or become indefinite or impossible or impractical of fulfillment, or if it shall not have been carried out for want of a trustee or because of the failure of a trustee to designate such purpose, the court may, on application of the trustee or of any interested person or of the Attorney General

In its opinion of January 5, 1970, the trial court concluded that "the residuary testamentary trust is a charitable trust, subject to the exercise of judicial *cy pres,* if necessary". On appeal, defendants-appellants contend that the trial court's application of the *cy pres* doctrine is in error. They argue that Rood's charitable trust contains specific charitable intent and not general charitable intent. Defendants' contentions are without merit. A careful review of the evidence establishes that Rood's will contains general charitable intent.

In analyzing Rood's intent, several rules of construction are applicable:

"Charitable gifts and trusts are favorites of the law and of the courts, and the courts will declare valid, and give effect to, such gifts and trusts where it is possible to do so consistently with established principles or rules of law." 14 CJS, Charities, § 6, p 427.

Charitable trusts are construed liberally and given effect whenever possible. See *John Robinson Hospital v Cross,* 279 Mich 407 (1937); *Wanstead v Fisher,* 278 Mich 68 (1936).

In construing testator's will, this Court must take cognizance of the presumption against intestacy where there exists a valid will, and where the residuary clause is under construction, the pre-

---

* * * order an administration or distribution of the estate for a charitable purpose in a manner as nearly as possible to fulfill the intention of the conveyor, *whether his charitable intent be general or specific."* (Emphasis added.) 20 PS § 301.10.

The commissioner's note states that this statute is in "accordance with the strong tendency of the courts to apply cy pres whenever possible and to limit very narrowly the right of the next of kin to get the property back." Report of the Joint State Government Commission of the General Assembly of Pennsylvania (1947), at p 84.

The note goes on to say that, except where the conveyor has made an alternative gift, the only question the court will consider is whether the original gift has failed, and if so, what other charity will become entitled to the property.

sumption against intestacy becomes especially significant. See *In re Nielsen's Will,* 256 Wis 521; 41 NW2d 369 (1950).

"Where a provision of a will is fairly open to more than one construction, a construction resulting in intestacy, either in whole or in part, will not be adopted if by any reasonable construction it can be avoided." 95 CJS, Wills § 615, p 834. *In re Chapple's Estate,* 338 Mich 246 (1953); *Parrish v Van Domelen,* 335 Mich 23 (1952); *In re Charleton's Estate,* 9 Mich App 625 (1968).

Thus, in determining whether testator had a general or specific charitable intent, we must construe testator's will so as to avoid intestacy if at all possible. We must also make this determination in a manner which is consistent with the special favoritism which the law has toward a charitable gift or trust.

In determining whether Rood's charitable intent is general or specific, the absence of a reverter clause or gift over in the event that the particular purpose fails is evidence of a general charitable intent.[10] Similarly, a general charitable intent will be implied where the bulk of donor's property is given for charitable purposes.[11]

---

[10] Bogert, Trusts & Trustees (2d ed), § 437, p 426. See also *O'Hara v Grand Lodge, Independent Order of Good Templars of Cal,* 213 Cal 131; 2 P2d 21 (1931); *Board of Education of City of Rockford v City of Rockford,* 372 Ill 442; 24 NE2d 366 (1939); *Trustees of Putnam Free School v Attorney General,* 320 Mass 94; 67 NE2d 658 (1946); *Thatcher v Lewis,* 335 Mo 1130; 76 SW2d 677 (1934); *Exeter v Robinson,* 94 NH 463; 55 A2d 622 (1947); see *School District No 70, Red Willow County v Wood,* 144 Neb 241, 247; 13 NW2d 153 (1944); *Accord, Cinnaminson Library Ass'n v Fidelity-Philadelphia Trust Co,* 141 NJ Eq 127; 56 A2d 417, 422 (1948) ("When a valid charitable trust has been created, without a provision for a reversion, it raises an implied condition against a reverter * * * ".)

[11] Bogert, Trusts & Trustees (2d ed), § 437, p 427. See also *Christian Herald Ass'n v First Nat Bank of Tampa,* 40 So 2d 563 (Fla, 1949); *Kentucky Children's Home v Woods,* 289 Ky 20; 157 SW2d 473 (1941); *Lynch v South Congregational Parish of Augusta,* 109 Me 32; 82 A 432 (1912); *Town of Brookline v Barnes,* 324 Mass 632; 87 NE2d 843

In the instant case, Rood did not provide a reverter or "gift over" in the event that his particular charitable purpose failed. Also, Rood devised his farm and all its implements in Alabaster Township, Iosco County, to Michigan State University, to be used as an experimental laboratory, "to discover better adapted species of cultivated plants and domesticated animals, more hardy species, less liable to disease, and better practices in farm management and in raising farm crops and animals, better adapted to the northeast part of Michigan". Rood did not disinherit his children, but provided a monthly stipend to each, as well as a small monthly stipend to his brother and sister. However, the bulk of Rood's estate was given in trust for charitable purposes.

Another fact indicating that Rood's intent was general is contained in his codicil, where he stated:

"Any school or college organized and operating in the State of Michigan which shall establish by a Decree of a Court of Record of this State that any school or college receiving benefits under this Will has for the period of one year or longer violated the provision of my Will shall for the succeeding twenty-five years receive the benefits under this Will which were formerly paid to the negligent or offending school under the same conditions as such former school."

While this clause could serve to foster vexatious litigation, it does indicate that Rood did not intend that the residue of his estate should revert to his heirs in the event that his particular purposes were not carried out. The fact that the testator directed his educational purposes to be fulfilled by another school or college in the event that the

(1949); *Wendell v Hazel Wood Cemetery,* 3 NJ Super 457; 67 A2d 219 (1949); *In re Mills' Will,* 121 Misc 147; 200 NYS 701 (1923); *R I Hospital Trust Co v Williams,* 50 RI 385; 148 A 189 (1929).

named trustees failed adequately to fulfill them, is an indication that Rood's charitable intent was general and not specific. The clear implication is that Rood, one way or another, intended some educational institution to benefit from his generosity.

Defendants-appellants ask this Court to find that Rood would have desired that his residuary trust fail if his particular purposes could not be carried out. This would require a narrow interpretation of Rood's will, which we are not inclined to give. Charitable trusts require a liberal interpretation most favorable to upholding the trust, if at all possible. Appellants cite *LaFond v Detroit,* 357 Mich 362 (1959), in support of their position that *cy pres* should not be applied.

*LaFond* was affirmed by an evenly divided court, and is of no precedential value.

The reasoning of Justice KELLY's opinion for affirmance in *LaFond* is open to question. There, the testatrix made a bequest to the City of Detroit to create a "playfield for white children". Apparently, the opinion affirming the trial court's denial of the application of *cy pres* equated the specific purpose of the gift with specific charitable intent. If that were the case, then *cy pres* would always be inapplicable because *cy pres* doctrine can only apply where the specific purpose of the trust fails due to impossibility, illegality, or impracticability. If the failure of the specific purpose meant that the settlor or testator had only a specific charitable intent, every failure of the specific purpose would invalidate the gift. Similarly, the statement in *LaFond* that the words "a playfield for white children" were "words of command" completely avoids the question of whether there was a general charitable intent on the part of the testatrix

therein. Certainly, every attempt to convey a charitable gift will contain "words of command". The question is not whether the gift contained words of command, but whether those words clearly and unequivocally indicate a specific charitable intent to the exclusion of a general charitable intent. The opinion for affirmance clearly ignores the most basic rules of construction which require that a will be construed so as to avoid intestacy if at all possible, and furthermore, the opinion adopts a narrow rather than a liberal construction of the will in order to defeat the gift, clearly in contravention of the doctrine that the law favors charitable gifts and the courts should liberally construe provisions of a charitable trust. If we are to rely on *LaFond* at all, we should prefer to rely on the language of Justice EDWARDS' opinion, wherein he states at 372–373:

"Nor do we find any impelling reason to construe the words of the testatrix so as to hold that her sole purpose was one of exclusion. This will on its face bestows the bulk of an old lady's estate upon the city where she and her husband spent their lives. It provides for an obvious charitable purpose—a playground. It provides for the playground to carry the family name.

"It would take clearer and more dramatic language than we find in this will for us to hold that testatrix' real intention was one of revenge than one of charity. Even if the word 'white' contained in her bequest be thought of as a word of exclusion (and the testatrix did not so require), we believe the basic purpose of the bequest is patently that of a memorial to her husband and herself to perpetuate their memory in a playground for children in the city of Detroit."

In a case similar to *LaFond* but which reaches an opposite result, *Howard Savings Institute of Newark v Peep,* 34 NJ 494; 170 A2d 39 (1961), the

testator made a gift to Amherst College as a scholarship fund "for deserving American-born, Protestant, gentile boys of good moral repute". The college adopted a resolution refusing to accept the gift, if restricted in use on such a discriminatory basis. The court there held that there was a general charitable intent so that *cy pres* could be applied. There was no reverter or "gift over" on the failure of the gift, and an intent to exclude testator's heirs was clearly shown. The principal object was the aid of Amherst College and not the forwarding of the interests of a particular race or religion. The court stated the term "general charitable intent * * * does not require an intention to benefit charity generally. It requires only a charitable purpose which is broader than the particular purpose, the effectuation of which is impossible, impracticable, or illegal". It is clear that, while testator in the instant case may have had the desire to perpetuate his particular political philosophies, he had a more general charitable intent to benefit the schools named as beneficiaries of his charities, and to benefit the educational process in general in the area of political science.

We specifically find that, under our construction of testator's will, there was general charitable intent on testator's part and that the *cy pres* doctrine is applicable.

We therefore affirm the trial court's application of the *cy pres* doctrine, under the Restatement of Trusts (2d), § 399.

## IV. The College Plans.

Both Alma College and Olivet College submitted plans for the effectuation of testator's charitable trust, which the trial judge approved as closely

approximating testator's desires under the doctrine of *cy pres.* We do not fully agree.

Neither of the college plans shows any desire to teach conservative political philosophy. While it is impossible to teach conservative political philosophy as testator desired and specified in his will, because it would unduly force the opinions and doctrines of Rood upon teachers and students, thereby abridging academic freedom and infringing upon freedom of expression, it is possible, consistent with academic freedom, to teach a course dealing with conservative political philosophy without relying on Rood's specific political philosophy. Therefore, this matter is remanded back to the trial court with directions to the colleges to submit plans which offer a course or program of study which would have a specific course dealing with conservative political philosophy. As a suggestion, we believe that a course dealing with the following subject matter would suffice:

(a) a course in conservative political philosophy in American politics;

(b) a course in American conservative politics;

(c) a course in conservative political science;

(d) a comparative course in conservative and liberal political science or philosophy.

In all other respects, the plans submitted by the two colleges are approved. If the colleges cannot or will not offer a course dealing with conservative political philosophy, either alone or on a comparative basis, this Court will order under its general equitable powers a substitute trustee who will offer such a course. See *In re Mears' Estate,* 299 Pa 217; 149 A 157 (1930).

Affirmed and remanded to the trial court for action consistent with part IV of this opinion.

All concurred.

## APPENDIX

## *LAST WILL AND TESTAMENT OF JOHN R. ROOD*

I, JOHN R. ROOD, residing in Alabaster Township, Iosco County, Michigan, hereby make and declare this to be my last will and testament, hereby revoking all former wills by me made.

*FIRST:* I desire to change the disposition of my estate heretofore made and, while health remains, I deem it part of wisdom to put it in form.

*SECOND:* With the state governments in the condition they are—a figure-head elected by popular vote for a set term, beyond control of the legislature to appoint or remove, instead of a chief executive, with no conservative branch in the legislature, and subordinate executives elected separately for set terms, in no way controllable by the governor, beyond legislative control, perhaps elected by and representing opposite parties, whereby all unity of action by the state executive is made impossible, and constant strife guaranteed, and accountability to the people rendered impossible; with local units organized in much the same manner, with the President of the United States elected practically by popular vote, entirely beyond control of Congress other than by impossible impeachment, the conservative Senate representing the state governments and for the protection of property and employment having been abolished by the Seventeenth Amendment, with no conservative element in the national government, and election going to those who promise every-

thing and anything, it seems to me we are in danger of going down the trail of England to socialism or communism, unless we can make the general public somewhat aware of the most fundamental natural laws of political science.

*THIRD:* Lest my intentions should be frustrated by teaching political practices other than such as is necessary to understand the application of the natural laws, and teaching doctrines contrary to my own, I deem it necessary to set forth here the bare bones of political science, as I desire it taught, viz.:

(1) Some reading of history and observations have firmly convinced me that the greatest blessings available to the human race are freedom, personal security and abundance, and that these blessings are attainable only under a federal form of government that enlists the aid of the natural laws affecting human conduct, and renders it impossible for those who have been entrusted with the administration to turn it into a system of exploitation and plunder of the public for their own gratification, and which discourages individuals from using the government to impose themselves as parasites on the community. No governmental machinery is needed for the millions of honest and conscientious. It is the anti-social and the masses, the demagogue and the ignorant dreamers, that need restraint for protection of all, and who will be the government if they can be.

(2) A provision that disables the legislative branch from initiating expenditures payable by taxation not previously requested by the executive seems also necessary, as in England, to prevent pork barrel legislation.

(3) History testifies that the only system that

has ever prevented the rulers turning government into a system of exploitation is a federal system, whereby the administrators of the local units are set up as a defense of the people against the lust for power by the administrators of the central government; to accomplish which it is necessary to create one branch of the legislature elected by adult suffrage; to elect which all adult citizens should have a vote, except the insane, idiotic and illiterate, who are, therefore, unable to reason sufficiently, the convicted criminals and other subversives who are anti-social, those on public welfare, pensioners, those receiving salaries, and creditors paid by taxation, who are, therefore, adversely interested against the rest of the community.

(4) To prevent self-seekers getting into this conservative house, its members should be required to servicwithout compensation other than necessary expenses proved to and allowed by the public auditor, as so often urged by Dr. Franklin and others in the convention that wrote the Constitution of the United States, and, finally, lost by only one vote.

(5) No class is safe which has no voice in the government, or when some other class is particularly dependent upon the government for their economic support and, therefore, especially active in elections.

(6) It is also necessary to create a separate house in the central assembly, the members of which are not chosen by popular suffrage, but by the local assemblies or municipalities, to protect the local governments from the central government; and to protect property from popular schemes of confiscation to reduce everybody to equality with the most destitute, whereby the accumulations of capital

which produce industrial products of high quality at low unit cost, and provide employment for the destitute, would be dissipated and everybody made destitute. The loss of the protection of such a body in England by the Act of 1911, which deprived the English House of Lords of an absolute veto on all legislation, and in the United States by the abolition of the United States Senate, elected by and representing the state governments, and substitution of another popular house elected by direct popular vote and not responsible to the state governments, is resulting in the grasping of unconstitutional powers by the national government, confiscatory taxation, and destruction of those accumulations of property on which the destitute depend for employment and the public depend for necessary industrial products.

(6-a) There is no more fatal popular conception concerning political science than the notion of the public that by paying more, better officers and representatives can be obtained. History proves that the more we pay, the more venal will seek appointment, and that corruption is greatest where most is paid to elected representatives; whereas, almost no corruption has ever been discovered in assemblies or other public offices such as boards of regents of universities and colleges, boards of control of hospitals and school boards, etc., serving without pay. The further notion that no one would seek the office if not paid is disproved by history, and there is no honor in receiving a salary, but much in serving without pay, and, therefore, such offices are sought with more vigor than offices which pay compensation. For example, English freedom from despotism was earned by a House of Commons serving without pay, risking their heads. John Eliot died in prison

for his faithful service to his country, and many other members of Parliament suffered long times of imprisonment because of their stand for the people when they were serving without pay, and the office was highly honorable. Again, the American colonies attained the best public government when represented by assemblies which could only vote supplies to the governor or refuse them, and without possibility of receiving any compensation themselves from the money they appropriated. Also, generally, serving without pay in many other instances might be enumerated.

The continental Congress of 1776, serving without pay, assembled for the purpose of risking their lives on conviction of high treason, and did not hesitate to subscribe the Declaration of Independence at the request of the President, John Hancock, to hang together, to which Benjamin Franklin drily added, "or we will surely all hang separately." President Eisenhower found no difficulty in inducing the highest paid men in America to surrender their $300,000 yearly salaries and their stockholdings, the savings of a lifetime, to accept the position of a member of his cabinet, paying one-thirtieth as much annually. There never has been any difficulty in inducing men to serve the public without pay, and the men who have never succeeded in anything for themselves and must, therefore, work for a living, would not be likely to do any better for the public than they have done for themselves, and are the very persons who should, if by any means possible, be kept out of the legislature, and be required to serve without compensation, if at all, because their interests are opposed to the interests of the general public if paid for their services. Such a plan also serves the additional purpose of guaranteeing to the people

that those in control (their elected representatives) cannot be financially and economically interested contrary to the interests of the general public, who pay the taxes and whom they are to serve.

(7) The ignorant and those who cannot or will not think propose to protect us from lobbyists and representatives of organized groups by paying larger salaries to elected representatives, but logic tells us that the more you pay the more venal will members of the legislature be, and history teaches that the best protection from special interests is the aroused public, and a conservative branch of the legislature receiving no salaries, chosen because of their high character and, therefore, above temptation to accept bribes. But, in the final analysis, there is no other means of protecting against the first law of nature than to abolish that law and induce humans to act contrary to their own interests. If our experience proves anything, it proves that no protection can be obtained by paying legislatures more, for lobbyists exist everywhere, and, in the nature of things, all groups watch legislation for self defense.

(8) There has always been a dream that the public could be protected by reducing all to the same level. But a moment's thought should convince everyone that so long as freedom remains we will have the few who secure themselves, and the many who are poor, and history testifies that we can only level down. It is not possible to level up. A glance at the map of the world should convince everyone that, where incentive to produce is destroyed by the insurity of property, everybody immediately becomes destitute, and the greatest sufferers are the destitute and the salaried workers, thereby deprived of employment and industrial products.

(9) The people of the states need this protection from the state governments as much as from the national government; wherefore, each state legislature should be composed of one house elected by the same adult suffrage as the national lower house, to represent the whole people, and a more conservative house, (not selected by popular vote, to protect the local municipalities, and the industries that provide employment for the propertyless class), elected by the boards of supervisors assembled by districts, no person being qualified to be a supervisor who should not be a substantial payer of direct taxes, nor anybody qualified to be a senator unless he were a more substantial taxpayer; likewise, to serve without compensation other than proved and allowed expenses, to protect the people from those seeking welfare and the office for the compensation it offers, and which protection would cause industries to flee to such states like mallards to a bird sanctuary.

(10) History also proves conclusively that the executive department of the government can be restrained from exploitation of the public only by being chosen and removable by the legislative department, as in England and other countries where popular governments exist, which was also intended by all the members of the convention which wrote the Constitution of the United States, the electoral college being designed by them only as a nominating device, which purpose was defeated by pledging the electors to the college to violate their oaths to support the Constitution.

(11) History proves that an executive having appointing powers and not created and removable by the legislature will dominate the legislature and reduce it to a mere confirmation of the executive. A dream of the builders of the national

Constitution that a legislative branch can be set up coordinate with the executive, each independent of the other, has never been realized, and all such attempts result in the executive dominating the legislature.

(12) Only by a government constantly under supervision and control of the peoples' chosen representatives, who are carefully guarded from having interests in conflict with those of the public, is it possible to obtain a government by and for the people. Choice of officers by popular election for a set term is a certain guaranty of a government not responsible to the people, officers on their own, responsible to and removable by nobody. And choice of a long list of executive officers by popular vote is a sure guaranty of government by and for the corrupt political boss, and devices like preferential primaries have been proven by long experience to be impediments and no way assisting the legislature in seeking the best executive unless the subordinate executives are appointed and removable by the chief as under the Constitution of the United States.

(13) In the judiciary, history also proves that competent impartial judges cannot be obtained by popular election, for two reasons, the people are not qualified to choose; only lawyers who have had experience with them are able to judge what lawyers have judicial capacity and qualifications; and judges cannot be impartial who must look to the people for re-election to retain their offices. Only by appointment as under the Constitution of the United States can qualified impartial judges be obtained, which has been almost lost by the Senate taking over and granting to its members the privilege of appointing judges, whereby appointments are, in effect, made by persons not known to the

people as appointers, therefore, not accountable for the conduct of the appointee, and used to pay political debts, which the Constitution intended should be appointed only by the President under the direction of the Senate.

(14) The first law of nature (self gratification, preservation and perpetuation), to which all living things must submit on penalty of extinction, absolutely guarantees that if the executive is not restrained by the representatives of the people (under no obligations to the executive) whatever is entrusted to the executive for service to the people will very soon be converted to the use of the executive, his subordinates, and the invisible special interests acting through and under it, and that what belongs to everybody belongs to nobody. Only by enlisting the service of this first law of nature by guaranty that whatever anybody produces is his own and that he shall not be deprived of the fruits of his labors under any pretext whatever can effective production for the benefit of the people in general be obtained.

(15) The second law of nature, which is in reality merely a corollary of the first (that every living thing shall seek gratification of its own desires by expenditure of the least possible effort on its own part, otherwise expressed as choice of the easy way), absolutely guarantees that most members of the public, who, by any possibility can do so, will impose themselves on the community and live as parasites at public expense; wherefore, no measure for relief of the unfortunate can be made to work if it provides support anywhere near approaching what the individual could provide for himself by his own efforts. Abundance for all may be had only by guaranteeing to all that what they create shall be taken from them under no pretext whatsoever,

never by stripping the industrious and the frugal to provide or protect the profligate, the slothful and the incompetent, by which system all are deprived of any incentive to produce anything for anybody. It is this system of self preservation and personal security in what he creates that accounts for the unparalleled progress of the United States during its first one hundred years.

(16) One thing against which the people need most protection is the government itself, for, as testified by Dr. Franklin on June 2nd in the Convention that wrote the Constitution of the United States—all that any government ever wants is more. There is no limit, and nothing can satisfy, and if not restrained by the written Constitution, they will, as Dr. Franklin said, reduce the entire population to slavery, as the Israelites in Egypt. This statement of Dr. Franklin is fortified and illustrated by the experience in England since the abolition of the House of Lords in 1911, and the adoption of the Seventeenth Amendment, whereby the Senate, planned by the Constitution-makers, was abolished and a second popular house created, subject to no restraint, and which has resulted in continually mounting taxes whereby our whole economy is threatened. Before that amendment was adopted, the United States never levied a billion dollars of taxes in any one year. President Truman vetoed a grant of thirty-seven billion as insufficient, and we are now threatened with a levy of a hundred billion. Another illustration— the State of Michigan never levied over a million dollars of taxes in any one year before the beginning of the present century, and now the governor says an allowance of two hundred thirty-five million for this year will leave a deficit of forty million. There can be no security from utter de-

struction by the government without some re-
straint upon taxation other than a popularly
elected assembly. Can we create a Constitutional
limitation on taxation which will save us?

(17) As a general proposition, I wish the *doc-
trines and contents of my primer of political sci-
ence* taught and made available to the public
schools. This political science primer, *The History
of Building the Constitution of The United States,*
and another book—*Family Security,* are now in
type, owned by me, and in storage at the printing
office of the Typocraft Company, 445 York Street,
Detroit, Michigan, and may be removed by my
executors and trustees, reprinted, or revised, as
the occasion may require.

*FIFTH:* Although my beloved wife Margaret and
I entered into a settlement prior to marriage
whereby each renounced any claim upon the es-
tate of the other, I desire as a further expression
of my affection for her to settle a part of my
property upon her; and, therefore, have obtained
and hereby devise and bequeath to her our prop-
erty located in the City of Detroit at number 132–
138 East Vernor Highway, together with the con-
tents thereof, except my books therein.

*SIXTH:* I devise and hereby bequeath my books,
or such of them as may be desired by the librarian
of Michigan State College, to the library of Michi-
gan State College, each to be marked as being
received from my donation and from my library.
Such books as are duplicates of books already in
the library, or are not desired, may be disposed of
in such manner as the trustees under this will
may desire, perhaps to the libraries of other col-
leges.

*SEVENTH:* I hereby devise and bequeath to Michigan State College my farm in Alabaster Township, Iosco County, Michigan, known and described as:

> The south quarter of Section 5, the southeast quarter and the south half of the northeast quarter of Section 7, the northeast quarter of Section 18, the north half of Section 17, and all of Section 8, except the east half of the northeast quarter, the northeast quarter of the southeast quarter, and so much of the northeast quarter of the northwest quarter as lies north of the Detroit and Mackinaw line;

to be held by the college in trust for maintenance of a laboratory, to discover better adapted species of cultivated plants and domesticated animals, more hardy species, less liable to disease, and better practices in farm management and in raising farm crops and animals, better adapted to the northeast part of Michigan. I also devise and bequeath to the said college all the implements and equipment on the farm used for agricultural purposes or in preparing the land.

*EIGHTH:* I give, devise and bequeath all the residue and remainder of my estate to the president, for the time being, of Michigan State College, at East Lansing, Michigan, the president for the time being, of Olivet College at Olivet, Michigan, and the president of Alma College at Alma, Michigan, and to their several successors, presidents of said colleges while so functioning, or to such of them as shall accept the trust hereby offered, said property to be held in perpetuity for the purposes of this will.

*NINTH:* I desire the said trustees and their successors to pay to my beloved son Royal D. Rood,

two hundred fifty dollars ($250.00) per month from the time of my death until he shall die or dispose of or encumber the same, said payments to be made into his hands and not to any creditor; and I also give, devise and bequeath in like manner, fifty dollars ($50.00) a month to my brother Dwight; fifty dollars ($50.00) a month to my sister Mabel; and twenty-five dollars ($25.00) a month to my daughter Marian.

*TENTH:* It is my desire that the bulk of said estate be kept invested in seasoned common stocks of corporations in the United States which have over a period of many years paid regular dividends and whose shares are traded in the New York Stock Exchange, the New York curb, or other established exchanges, but the said trustees may retain any investments I have made, though not such as are allowed to be kept by trustees under the laws of Michigan, and may sell and re-invest, as above specified.

*ELEVENTH:* Should all of the trustees named under this will reject the appointment, I wish the Probate Court of Iosco County to appoint a suitable successor or successors, but in no event shall any corporation for profit be appointed as successor trustee under this will.

*TWELFTH:* It is my wish that the residue of said estate be kept as a perpetual fund, the income only being used to teach political science, as above specified, in the said colleges, and in other schools and by public debates, under the limitations above described.

*THIRTEENTH:* I desire that my executors and trustees serve for the compensation allowed by

statute; and that all charges for management of the estate shall in no case exceed 5% of the gross receipts.

*FOURTEENTH:* My estate at the present time consists of the said farm; Detroit residence; an apartment building on the corner of Schoolcraft and Manor Avenue, in Detroit; a vacant lot known as Lot 47, Avery Park Subdivision, in the village of Wayne; a quarter interest in the farm where I was born, in Section 10, Lapeer Township, Lapeer County, Michigan; and all of the McLellan Farm in Section 4, which has not been sold; and certain stocks and bonds now on deposit in safe deposit boxes in the Commonwealth Commercial Bank, and the Wabeek State Bank, in Detroit, or deposited as collateral, and small cash balances in my banking accounts.

*FIFTEENTH:* I desire that securities belonging to this fund, except when being transferred, be kept in the treasury of the Michigan State College at Lansing for security, and that the Probate Court, to economize expenses, be allowed to fix only such bond as may be deemed necessary for safety of the funds, any statute of this state to the contrary notwithstanding.

*SIXTEENTH:* While my estate is rather small, it is my hope that other public spirited citizens may be induced to add to the fund if a foundation can be set up to function for education of the people in the principles of political science, entirely apart from political practices, and such donations may be made merely by stating that the gift is made to the John R. Rood Educational Foundation.

*SEVENTEENTH:* I hereby nominate and appoint the said Trustees as executors of this will, or such of them as shall accept the trust.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 4th day of February, 1953, at the City of Detroit, Michigan.

*John R. Rood (L.S.)*

The foregoing instrument, all on fifteen (15) pages of paper, including this sheet, and the sheets hereof initialed by me for identification, was on the date thereof, signed, sealed, published and declared by the said JOHN R. ROOD as and for his Last Will and Testament, in the presence of the undersigned, and we, at his request, and in his presence, and in the presence of each other, have hereunto subscribed our names as attesting witnesses to said Last Will and Testament on the day and year last above written, as he, the said John R. Rood, then and there requested us so to do, and to testify that at the time of execution of said will he was apparently of sound and disposing mind, testamentary capacity, and free from any restraint or undue influence.

*Eric Wilson* residing at *16760 Heyden Ave. Detroit, Mich.*
*Bertha Farber* residing at *2911 Monterey Ave. Det. Mich.*

## CODICIL TO THE LAST WILL AND TESTAMENT OF JOHN R. ROOD

1. I hereby declare this to be a Codicil to my Last Will and Testament.

2. The trustees under my Will shall present a complete bound copy of each of the following of my books:

1. "History of Building the Constitution of the United States"

2. "A Political Science Primer"

3. "A First Book on Government"

containing a true and complete copy of this Codicil to each student first enrolling in any course on political science, constitutional history, or economics, in any school or college receiving benefits under my Will.

3. It is not my desire to dictate opinions or doctrines to any teacher or to abridge freedom of expression. Each teacher in any school receiving benefits under this Will announcing any doctrine conflicting with the contents of said books shall at the time of making such statement explain to the members of the class why and wherein the statements in said books are mistaken or erroneous; and each school or college receiving benefits under this Will shall offer courses covering the substance of the matter contained in said books.

4. Any school or college organized and operating in the State of Michigan which shall establish by a Decree of a Court of Record of this State that any school or college receiving benefits under this Will has for the period of one year or longer violated the provision of my Will shall for the succeeding twenty-five years receive the benefits under this Will which were formerly paid to the negligent or offending school under the same conditions as such former school.

5. In Witness Whereof, I have hereunto set my hand and seal this Sixth day of April, A.D., 1955.

*John R. Rood L.S.*
John R. Rood

The foregoing Codicil was executed in the presence of the undersigned witnesses and of each other on the day above mentioned whereupon we have subscribed this paper to witness the due execution thereof.

*William F. Beyer* Residing at *16149 Ashton*
William F. Beyer                 *Detroit, Mich.*
*Gloria J. Giezyng* Residing at *20521 Washtenaw*
Gloria J. Giezyng                *Harper Woods, Mich.*
*Clarence T. Wilson* Residing at *15460 Birchcrest*
Clarence T. Wilson               *Detroit 21 Mich.*